# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**John Brown and Barbara Brown,**

    **Plaintiff,**

**v.**            **Case No. 15-9587-JWL**

**K&L Tank Truck Service, Inc.;**
**Alfonso Martinez; and Tom Herrell,**

    **Defendants.**

## <u>MEMORANDUM & ORDER</u>

Plaintiffs John and Barbara Brown filed this diversity suit against defendants asserting numerous claims arising out of the termination of the Browns' employment with defendant K&L Tank Truck Service, Inc. (K&L) and the sale of Mr. Brown's shares of K&L stock. This matter is now before the court on defendants' motion for partial summary judgment (doc. 67) in which defendants seek summary judgment on all but one of the claims asserted by plaintiffs. As will be explained, defendants' motion is granted in part and denied in part. The motion is denied as to plaintiffs' breach of contract and unjust enrichment claims and is otherwise granted.

## I.  Facts

The following facts are uncontroverted or related in the light most favorable to plaintiffs as the nonmoving parties. K&L Tank Truck Service, Inc. (K&L) is an oilfield services company in Garden City, Kansas. K&L primarily hauls water for oilfield drilling and operations. It is a Kansas "C" corporation for tax purposes. Plaintiffs John and Barbara Brown purchased K&L in the 1970s and continued to own it until they sold it to an Employee Stock Ownership Plan

(ESOP) in the 1990s. When plaintiffs sold the last of their stock to the ESOP in 1998, they entered into written employment contracts with K&L for a three-year term. Pursuant to those contracts, John Brown acted as Operations Manager and Safety Director of K&L for a 12-month period and, for the remaining two years of the contract period, Mr. Brown acted only as the Safety Director. Barbara Brown acted as President of K&L for the three-year term. On August 23, 2001, the shareholders and directors of K&L held a joint annual meeting. As reflected in the minutes of that meeting, Ms. Brown announced that she and John Brown would be semi-retiring to Florida effective September 1, 2001. Following a discussion, K&L agreed to retain the Browns as consultants for a three-year period. In June 2004, the Board of Directors agreed to extend the Browns' contract as consultants through September 1, 2007. After that time, the minutes of the Board reflect no discussions about the Browns' continued employment and yet the Browns continued to remain employed by K&L until November 2013.

In 2004, defendant Alfonso Martinez became the president of K&L. Prior to that time, Mr. Martinez had been the vice president of K&L as well as a director. During this same time frame, defendant Tom Herrell, also a director, became the vice president of K&L and plaintiff John Brown became a director. From 2004 through November 2013, K&L's Board of Directors consisted of Mr. Martinez, Mr. Herrell and Mr. Brown. In November 2004, Mssrs. Martinez, Herrell and Brown agreed to a plan to buy K&L back from the ESOP. As part of this plan, Mr. Martinez, according to Mr. Brown's testimony, asserted that he did not "want anybody to ever be able to fire" him. Mr. Brown, then, agreed that Mr. Martinez could purchase 60 percent of K&L's stock such that he would become the majority shareholder. Mr. Brown also agreed to guarantee the loan that K&L needed to buy its stock back from the ESOP. Partly in response to

Mr. Martinez receiving a 60 percent share of K&L's stock, Mr. Brown made it clear to Mr. Martinez that, in exchange for his agreement to guarantee the loan, he wanted lifetime employment and health insurance coverage for himself and Ms. Brown. According to plaintiffs, Mr. Martinez agreed to Mr. Brown's request. Mr. Brown testified that he would not have guaranteed the loan without the agreement to lifetime employment and health insurance. While defendants dispute that any discussion concerning lifetime employment and insurance occurred between Mr. Brown and Mr. Martinez during this time period, they assume for purposes of their motion for summary judgment that a discussion regarding lifetime employment occurred. It is undisputed that no such agreement was ever brought to Mr. Herrell (the only other director) for approval.

In mid-November 2004, Mr. Brown was elected as a trustee of the ESOP during a special meeting of the Board of Directors and, in late November 2004, the ESOP was terminated by K&L. While each ESOP participant had an election of whether to receive their distribution in shares of K&L stock or in cash (or partly in each), all the participants elected to receive their distribution in cash or in some form that enabled K&L to buy back 100% of the stock of K&L.[1] The sale was completed in early 2005 at a price determined by an appraisal. The appraisal determined that the K&L stock was worth $1714 per share for the 700 shares. Ultimately, K&L obtained a roughly $500,000 loan secured by the assets of K&L and by one-third guarantees from Mssrs. Martinez, Herrell and Brown. Viewed in the light most favorable to plaintiffs, the

---

[1] While Mr. Martinez and Mr. Herrell had the option to receive the value of their shares of the ESOP in a cash distribution, they elected instead to take promissory notes from K&L for the value of their shares so that K&L was not required to borrow more money in connection with the buy-back loan.

evidence reflects that K&L would not have obtained the loan without Mr. Brown's guarantee in light of his financial position and his relationship with the bank. K&L paid the ESOP for the stock using the loan proceeds and some of its own funds. K&L then issued ten shares of stock to the new owners—six to Mr. Martinez; two to Mr. Herrell; and two to Mr. Brown—and was paid $1714 for each share for a total of $17,140. The ownership of K&L remained the same from that time until November 2013. Under this new ownership, K&L experienced several profitable years of operation. K&L paid off the buy-back loan in full according to its terms and none of the guarantors were called on to pay any of the loan.

More than two-thirds of K&L's business came from one customer—BP Amoco, which subsequently sold its southwest Kansas operations to Linn Energy in 2011. In 2013, Linn Energy required K&L to re-bid for its work and K&L lost that bid. While K&L did not lose all of its Linn Energy work through that bid, it is undisputed that it lost a substantial portion of its total work when it lost the Linn Energy bid. When the Browns came to Kansas from Florida in November 2013 for K&L's annual end-of-year meetings, Mr. Martinez told Mr. Brown that K&L could not afford the services of the Browns anymore because K&L was experiencing a financial crisis in light of the lost Linn Energy business. The record reflects that Mr. Martinez and Mr. Herrell had come to believe that K&L was "wasting its money" on the Browns' services. Ultimately, Mr. Brown sold his two shares of stock for a total price of $450,000 and resigned as a director. The Browns were effectively terminated at the end of November 2013.

Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

## II.     Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Water Pik, Inc. v. Med–Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013) (quotation omitted); *see* Fed. R. Civ. P. 56(a). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Water Pik, Inc.*, 726 F.3d at 1143 (quotation omitted). "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Id*. at 1143-44.

## III.     Contract for Lifetime Employment

In the pretrial order, plaintiffs set forth a breach of contract claim asserting that Mr. Martinez promised that K&L would employ the Browns and provide health insurance to the Browns for their lifetimes. While plaintiffs have not clearly articulated the contours of their breach of contract claim, the pretrial order together with plaintiffs' briefing on summary judgment indicates that plaintiffs are asserting two separate but related contracts. The first contract is one between John Brown (for himself and the benefit of Barbara Brown) and Mr. Martinez in his individual capacity in which Mr. Brown agreed to guarantee the loan and agreed that Mr. Martinez could purchase the majority of K&L's stock in exchange for Mr. Martinez's promise to cause K&L to provide lifetime employment to the Browns. The second contract is

one between John Brown (for himself and the benefit of Barbara Brown) and the corporation, made by Mr. Martinez in his capacity as president of K&L, in which Mr. Brown promised to guarantee the loan in exchange for K&L's promise (via K&L's president) to employ the Browns for life. Defendants' motion for summary judgment is based on the assumption that plaintiffs are alleging only one contract—the one in which Mr. Martinez acts in his capacity as president of K&L. Thus, at a minimum, plaintiffs' claim that Mr. Martinez breached a contract in which he agreed (while wearing his individual "hat" as opposed to his president's "hat") to cause K&L to provide lifetime employment to the Browns in exchange for the opportunity to purchase the majority of K&L's stock must be resolved at trial.

The court turns, then, to plaintiffs' claim that Mr. Martinez, in his capacity as president of K&L and on behalf of K&L, agreed to provide lifetime employment to the Browns. Defendants move for summary judgment on the grounds that Mr. Martinez had no actual authority to bind the corporation to a lifetime employment contract. Defendants further contend that the unauthorized agreement was never ratified by the corporation. *See Osborn v. Grego*, 226 Kan. 212, 216 (1979) (an unauthorized act of an agent may be ratified by a principal, and when ratified is the equivalent of an original grant of authority). As will be explained, defendants have not shown that they are entitled to summary judgment on this claim. For even assuming that Mr. Martinez lacked actual authority to bind K&L to the lifetime employment contract,[2] factual questions exist as to whether Mr. Martinez had the apparent authority to do so—an issue which K&L addresses for the first time in its reply brief. Because a jury must resolve in the first

---

[2] The court does not rule out the possibility that plaintiffs may be able to prove at trial that Mr. Martinez had actual authority to bind K&L to a lifetime employment contract with the Browns.

instance whether Mr. Martinez had the apparent authority to bind K&L to the contract, the court declines to address at this juncture K&L's argument concerning ratification.

Apparent authority can be created by appointing a person to a position . . . which carries with it generally recognized duties." Restatement (Second) of Agency § 27 cmt. a (1958). "[T]o those who know of the appointment there is apparent authority to do the things ordinarily entrusted to one occupying such a position, regardless of unknown limitations which are imposed upon the particular agent." *Id*. The question of an agent's apparent authority to bind his principal to a contract of lifetime employment has not been squarely addressed by Kansas courts. In *Schiffelbein v. Sisters of Charity of Leavenworth*, 190 Kan. 278, 279, 283 (1962), the Kansas Supreme Court held that the plaintiff alleged sufficient facts in his petition to survive a motion to dismiss where he alleged that he relied on the apparent authority of a hospital administrator who offered him lifetime employment in exchange for a promise not to sue the hospital for a work-related injury he sustained while employed at the hospital. The Court bypassed the apparent authority issue and concluded that the petition contained sufficient facts to support the conclusion that the hospital had ratified the administrator's act. *Id*. at 280-81. While the Court appeared to question whether the administrator had apparent authority to bind the hospital to a lifetime employment contract, *see id*., the Court cited to *Townsend v. Missouri Pacific Railway Co*., 88 Kan. 260 (1912) on the issue of apparent authority. In that case, the Court recognized that whether an agreement to give employment for an extended period (in that case, nine months) is within the apparent scope of authority of an agent is a question of fact. *Townsend*, 88 Kan. 260, 128 P.3d 389, 390 (1912). Moreover, the Tenth Circuit has held that in certain circumstances a high-level executive may have apparent authority to execute a lifetime

employment contract.  *See Townsend v. Daniel, Mann, Johnson & Mendenhall*, 196 F.3d 1140, 1146 (10th Cir. 1999) (jury could find that corporate vice-president, who was second in command only to the president, possessed apparent authority based upon the company's entrusting him with second-in-command responsibilities and his superior position vis-à-vis plaintiff, a vice president at the firm) (applying Colorado law).

Based on the evidence in the record before the court, a jury could reasonably find that special circumstances exist in this case sufficient to conclude that Mr. Martinez had apparent authority to execute lifetime employment contracts with the Browns.  To begin, the court notes that defendants do not challenge Mr. Martinez's authority to bind K&L to employment contracts generally—they challenge only the extent of the commitment that Mr. Martinez was authorized to make.  And several key facts bear on the term of employment that Mr. Martinez might offer to the Browns—the Browns' extensive history with and knowledge of K&L; their age at the time of the alleged agreement (at least 60 years of age); the fact that they were employed as semi-retired consultants who presumably were not exercising executive discretion or managerial responsibility; and the fact that Mr. Brown was unwilling to guarantee the loan without the assurance of lifetime employment.  In view of these circumstances, and defendants' failure to address the apparent authority issue in its opening brief, the court concludes that there is sufficient evidence of Mr. Martinez's apparent authority to justify submission of the issue to the jury.  *See Farmer v. Arabian American Oil Co*., 277 F.2d 46, 52 (2d Cir. 1960) (recognizing special circumstances in which an agent may have apparent authority to execute a lifetime employment contract).

The court addresses K&L remaining arguments in fairly short order. K&L asserts that any contract for lifetime employment is void or voidable by K&L on the grounds that it is an "interested director" contract under K.S.A. § 17-6304, which sets forth various means by which such contracts may be validated.[3] According to K&L, John Brown was acting as an interested director of K&L when he entered into a contract for lifetime employment. Given the nature of the promise made to Mr. Brown (lifetime employment for the Browns), the evidence viewed in the light most favorable to plaintiffs suggest that Mr. Brown was acting not as a director of K&L at the time of the alleged contract but as an employee of K&L at the time of the contract. It may be that defendants ultimately prove that Mr. Brown was wearing his director "hat" at the time promises were exchanged, but that issue is one for the jury to decide. Similarly, the court rejects the argument that Mr. Martinez cannot be held personally liable under the contract because Mr. Brown sought lifetime employment from K&L rather than Mr. Martinez. Factual issues exist concerning whether Mr. Martinez made the alleged promise of lifetime employment in his capacity as president of K&L (in which case K&L would be liable and not Mr. Martinez); in his capacity as an individual seeking to purchase the majority of K&L's stock (in which case he could be liable for failing to cause K&L to provide lifetime employment to the Browns); or in both capacities. Again, these are questions that must be resolved at trial.

Finally, Mr. Martinez asserts that the statute of limitations has expired as to any breach of contract claim against Mr. Martinez. According to Mr. Martinez, any such contract was breached back in 2004 or 2005 when Mr. Martinez failed to obtain the Board's approval of the

---

[3] While K&L's assertion that the statute sets forth the exclusive means for validating interested director contracts, it cites no authority for that assertion and the court need not decide here whether other means of validation—such as common law ratification of the contract—exist.

lifetime employment contract.  This argument again assumes the existence of only one potential contract—a contract between Mr. Brown and Mr. Martinez as the president of K&L.  But the record is sufficient to support the existence of a another contract—one between Mr. Brown and Mr. Martinez as an individual who promised 'to cause K&L to provide lifetime employment to the Browns.  Under that scenario, Mr. Martinez was not required to obtain Board approval or ratification because K&L would not be liable to the Browns for any breach of the contract.  The court, then, rejects Mr. Martinez's statute of limitations defense.

IV.     **Purported Extension of 1998 Employment Contracts**

On August 1, 1998, K&L entered into written employment contracts with both plaintiffs. Those contracts expressly provided for a three-year term of employment, ending August 31, 2001.  In the pretrial order, plaintiffs—as an alternative to their claim concerning lifetime employment—assert that the contracts were periodically "extended" by K&L beginning in 2001 such that the parties remained bound by the terms of the 1998 contracts (including an attorneys' fee provision) to the extent those provisions were not amended by the parties.[4]  Plaintiffs, then, assert that defendants breached the terms of the 1998 contract by terminating plaintiffs' employment in November 2013.  In their motion for summary judgment, defendants seek a

---

[4] In fact, plaintiffs allege that K&L "renewed" the 1998 contracts beginning in 2001.  "But, as ordinarily understood, a 'renewal' suggests '[t]he re-creation of a legal relationship or the replacement of an old contract with a new contract, as opposed to the mere extension of a previous relationship or contract.'"  *Garrett v. Branson Commerce Park Community Improvement Dist.*, 645 Fed. Appx. 710, 712 (10th Cir. Apr. 14, 2016) (quoting Renewal, Black's Law Dictionary (10th ed. 2014)).  Because the essence of plaintiffs' argument is that there was one ongoing agreement in this case as opposed to a new contract, the court has utilized the word "extend" as opposed to "renew."

determination that the 1998 contracts were not extended and that the terms of those contracts were not binding on defendants in November 2013. As will be explained, the court agrees with defendants and grants summary judgment on this issue.

John Brown's 1998 employment contract established a "term" during which Mr. Brown acted as Operations Manager and Safety Director of K&L for a 12-month period at a salary of $72,000 per year plus a discretionary bonus. For the remaining two years of the contract period, Mr. Brown acted only as the Safety Director at a salary of $14.400 per year. In addition, K&L agreed to reimburse Mr. Brown for all job-related expenses; to provide six (6) weeks paid vacation; and to provide health insurance during the term of the agreement. The contract expressly states that it extends "from the date hereof for a period of three (3) years and one (1) month ending August 31, 2001." Barbara Brown's 1998 employment contract contained many of the same terms—including K&L's agreement to reimburse job-related expenses; to provide six (6) weeks paid vacation; and to provide health insurance. Ms. Brown's contract established a "term" during which Ms. Brown acted as President of K&L at a salary of $72,000 per year plus a discretionary bonus. Like Mr. Brown's contract, Ms. Brown's contract expressly states that it extended "from the date hereof for a period of three (3) years and one (1) month ending August 31, 2001."

On August 23, 2001, the shareholders and directors of K&L held a joint annual meeting. As reflected in the minutes of that meeting, Ms. Brown "announced that she and John Brown would be semi-retiring effective September 1, 2001." Following a discussion, K&L agreed to "retain John Brown and Barbara A. Brown as employees in the position of consultants for a period of three (3) years from and after September 1, 2001." The minutes further reflect that

K&L agreed to provide plaintiffs a computer, facsimile machine and copy machine for use in connection with their employment. With respect to compensation, K&L agreed to pay the Browns $800.00 per month "during the three (3) year term mentioned above" and to "furnish health insurance coverage to them." In June 2004, the Board of Directors agreed to extend "John and Barbara's current contract as consultants through September 1, 2007." After that time, the minutes of the Board reflect no discussions about the Browns' continued employment and Mr. Herrell could not recall ever discussing the Browns' continued employment after the June 2004 meeting.

In the pretrial order, plaintiffs assert that K&L, beginning in 2001, extended plaintiffs' 1998 contracts such that the terms of those contracts remain in effect unless specifically amended by the parties. Defendants seek a determination that the 1998 contracts were not extended in 2001; that the 1998 contracts expired consistent with the terms of those contracts; and that the consulting arrangement that began in 2001 represented a new contract between the parties. Kansas law provides that the proper interpretation of a contract is a question of law for the court. *Liggatt v. Employers Mutual Casualty Co*., 273 Kan. 915, 927 (2002).[5] Whether a contract is ambiguous is also a question of law for the court. *Clark v. Wallace County Cooperative Equity Exchange*, 26 Kan. App. 2d 463, 465 (1999). "If the contract is found to be unambiguous, the court must interpret the contract solely within its four corners, and extrinsic evidence is inadmissible." *Id*.

---

[5] None of the parties address any choice-of-law issue relating to this claim but both sides cite to Kansas cases in their submissions.

The court finds no ambiguity here and concludes that the original contracts terminated on August 31, 2001 and a new contract began on September 1, 2001. The minutes of the meeting discussing the consulting agreement make no mention of the 1998 written contracts or any of the terms contained in those contracts. Moreover, the consulting agreement was dramatically different than the prior agreement with respect to job positions and duties, compensation and the level of involvement with the company—with the Browns moving from an active status to a "semi-retired" one. There is nothing in the minutes of the 2001 meeting to suggest that K&L was extending the original agreements. And, as defendants highlight, this conclusion is buttressed by the minutes from the June 2004 meeting in which K&L expressly "extended" the Browns' "current contract as consultants" through September 1, 2007. Unlike the 2001 minutes, the 2004 minutes clearly extend the 2001 agreement.

Plaintiffs' arguments in favor of finding an extension are not persuasive. Plaintiffs highlight that the Board in 2001 agreed to "retain" the Browns and assert that the word "retain" suggests a "continuation of the Browns' prior status." But the Browns' prior status was as President and Operations Manager/Safety Director rather than as consultants. So, contrary to plaintiffs' argument, K&L was surely not continuing the Browns' prior status. Rather, it is clear that K&L agreed to "retain" the Browns as employees both in the sense that the Browns would remain on the payroll and that the Browns were being hired as consultants. *See* Black's Law Dictionary (10th ed. 2014) (defining "retain" as "To hire; to engage for the provision of services (as by a lawyer, an accountant, an employee, etc.).").

The court also rejects plaintiffs' argument that the 2001 agreement does not contain the "complete" agreement such that it is necessarily an extension of the 1998 agreement. Plaintiff

directs the court to only two examples of "missing" terms in the 2001 agreement. First, plaintiff notes that the 2001 agreement does not describe plaintiffs' job duties. But plaintiff directs the court to no authority suggesting that such details are required to render an employment agreement "complete" and, in any event, it defies common sense to look to the 1998 agreement for such details when the 2001 agreement clearly and significantly changed the nature and scope of plaintiffs' job duties. Second, plaintiff asserts that the 2001 agreement does not address the reimbursement of job-related expenses but yet K&L continued to reimburse them for such expenses. K&L's reimbursement of such expenses, however, is not a function of the 1998 contracts but rather a function of a corporate policy under which K&L reimburses all employees for job-related expenses. Nothing about K&L's reimbursement of expenses, then, suggests that the 1998 contracts remained in place.

In conclusion, the court sees nothing in the 2001 agreement that suggests an extension or modification of the 1998 contracts or the adoption or incorporation of any terms of the 1998 contracts. As a matter of law, the 1998 contracts expired consistent with their express terms and were not extended by K&L.

## V.     Unjust Enrichment

In the pretrial order, plaintiff John Brown asserts a claim of unjust enrichment against all defendants as an alternative to his breach of contract claim. To state a claim for unjust enrichment, plaintiff must prove: (1) a benefit conferred upon the defendant by the plaintiff; (2) the defendant retained the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust. *See Estate of Draper v. Bank of America, N.A.*, 288 Kan. 510, 534 (2009);

*see also Haz–Mat Response, Inc. v. Certified Waste Servs. Ltd.*, 259 Kan. 166, 177 (1996) (stating second element as "an appreciation or knowledge of the benefit by the defendant").

Defendants move for summary judgment on this claim. K&L asserts that summary judgment is appropriate because no reasonable jury could find that Mr. Brown conferred a benefit on K&L or that K&L had notice that Mr. Brown expected payment beyond what he had already received. Mr. Herrell moves for summary judgment on the grounds that no reasonable jury could conclude that he had notice that Mr. Brown expected payment beyond what he had already received. Mr. Martinez moves for summary judgment on the grounds that Mr. Brown did not expect to receive the benefit of lifetime employment from Mr. Martinez personally.[6]

K&L asserts that Mr. Brown conferred no benefit on it because Mr. Brown's guarantee of the loan essentially reduced the value of K&L by over $480,000. K&L provides no authority suggesting that the court should analyze the asserted benefit through the narrow lens utilized by K&L. Factual issues exist as to whether Mr. Brown conferred a benefit on K&L when he helped secure the loan (a loan that K&L could not have obtained otherwise) which permitted K&L to buy back its shares from the ESOP and arguably become more profitable over the course of the next several years.

K&L and Mr. Herrell assert that Mr. Brown cannot establish his claim unless he comes forward with evidence that they knew that he expected payment in the form of lifetime

---

[6] For the first time in their reply brief, defendants assert that summary judgment is appropriate for additional reasons, including that the evidence demonstrates that Mr. Brown was fairly compensated for the benefit he provided and that Mr. Brown incurred no expense in providing the benefit to defendants. Defendants also assert that Mr. Brown's claim undermines the "strong public policy against self-dealing director contracts." The court declines to address these arguments. *Lynch v. Barrett*, 703 F.3d 1153, 1160 n.2 (10th Cir. 2013) (court does not consider arguments raised for the first time in reply brief).

employment and health insurance in addition to the shares of stock that he received. This argument is flawed in several respects. First, the argument is based on a recitation of elements not found in Kansas law. To the extent Kansas recognizes the concept of notice for purposes of an unjust enrichment claim, that notice relates to the benefit provided rather than the specific payment or compensation expected. *See Haz-Mat Response, Inc.*, 259 Kan. at 177 (the defendant must have knowledge of the benefit provided by the plaintiff). Clearly, K&L and Mr. Herrell had knowledge that Mr. Brown guaranteed the loan. Second, the notice requirement referenced by defendants contemplates notice that the plaintiff expected to be compensated for the benefit provided. While the defendants assert that they did not know Mr. Brown expected compensation beyond the shares of stock he received, a reasonable jury could conclude otherwise. This is particularly true because Mr. Brown did not receive the shares of stock in exchange for his loan guarantee—he paid for the shares. A jury, then, could conclude that K&L and Mr. Herrell reasonably should have known that Mr. Brown expected to be compensated in some form for the risk he incurred when he guaranteed the loan. Finally, while none of the parties addresses the issue, defendants' focus on Mr. Brown's expectation of lifetime employment and health insurance misconstrues the appropriate measure of damages for unjust enrichment claims. The proper measure of damages on this claim is not the damages incurred by the Browns from the corporation not performing under the alleged contract (in other words, the benefit of the bargain) but the value of the benefit he conferred. Thus, unless the Browns can show that the damages incurred from the loss of lifetime employment and insurance was equal to the value of the benefit Mr. Brown conferred on Mr. Martinez and/or the corporation,

the parties' focus on the promise of lifetime employment and insurance is misplaced in connection with this claim.

Finally, Mr. Martinez asserts that he is entitled to summary judgment on this claim because Mr. Brown was not expecting lifetime employment and health insurance from Mr. Martinez personally. But again, this is not the proper measure of damages. In any event, factual questions exist as to whether Mr. Martinez received a benefit from Mr. Brown for which he should compensate Mr. Brown in order to avoid unjust enrichment. Summary judgment, then, is denied.[7]


## VI. Fraud

In the pretrial order, plaintiff asserts that Mssrs. Martinez and Herrell "misrepresented the value of the stock and the financial state of the Company to induce John Brown to sell his stock shares for an amount less than what they were actually worth." He asserts damages in an amount representing the difference between the true value of the stock and the amount paid to him for the stock.[8] Under Kansas law, "fraud is never presumed and must be established by clear and convincing evidence." *Alires v. McGehee*, 277 Kan. 398, 403 (2004). The elements of fraud are as follows: (1) an untrue statement of fact; (2) known to be untrue by the party making it; (3) made with the intent to deceive or with reckless disregard for the truth; (4) upon which

---

[7] As he did in connection with Mr. Brown's breach of contract claim, Mr. Martinez asserts that the statute of limitations has expired on any unjust enrichment claim asserted against him. The court rejects that argument for the same reason set forth in connection with the breach of contract claim.

[8] In his submissions, Mr. Brown expands on his damages theory and asserts that, even if the sale price was fair, he has suffered damages in the form of lost dividends since he sold the stock. Because this theory of damages does not appear in the pretrial order, it has been waived.

another party justifiably relies and acts to his or her detriment. *Id.* at 1199. Defendants move for summary judgment on Mr. Brown's fraud claim on the grounds that Mr. Brown cannot establish that he relied on any statements made by Mr. Martinez or Mr. Herrell in connection with the sale of his stock. The court agreed and concludes that, in light of Mr. Brown's own testimony, no reasonable jury could find that Mr. Brown relied on any statements in connection with the sale of his stock.

In his submissions, plaintiff directs the court to three statements upon which he allegedly relied in deciding to sell his shares. He contends that on November 23, 2013, Mr. Martinez told him that there would be no year-end shareholder distribution; that Mr. Martinez and Mr. Herrell told him on several occasions between November 23, 2013 and November 25, 2013 that the company was in a "financial crisis" in light of the lost Linn Energy business; and that Mr. Herrell told him during this time frame that Mr. Martinez wanted to move the company "in a different direction."[9] Mr. Brown testified that, based on these statements, he wanted to sell his stock but remain an employee. Despite the allegations in the pretrial order, there is no evidence or allegation in the record that Mr. Martinez or Mr. Herrell made any statement concerning the value of Mr. Brown's stock.

The court begins with Mr. Brown's assertion that he relied on Mr. Martinez's November 23, 2013 statement that no year-end shareholder distributions would be made. As defendants highlight, Mr. Brown's own recitation of the facts demonstrates that he could not have relied on

---

[9] In their submissions, plaintiffs assert that Mr. Martinez and Mr. Herrell told Mr. Brown in November 2013 that the company was "insolvent." The citation to the record provided by plaintiffs contains no such statement and the court cannot otherwise find any evidence in the record supporting that statement.

that statement in connection with the sale of his stock. According to Mr. Brown, on November 25, 2013, Mr. Martinez, Mr. Herrell and Mr. Brown all met with the company's independent accountant (two days after the statement was made by Mr. Martinez and before Mr. Brown sold his shares) to discuss the potential shareholder distribution for 2013. Mr. Brown testified that during that meeting, the accountant set forth various options for the shareholder distribution, including a total distribution of $700,000; $400,000; $200,000; and no distribution at all. Mr. Brown concedes that Mr. Martinez, during the meeting, "indicated that he was more in favor of $200,000 than anything else" but that Mr. Brown did not know what the "final bonus figure" would be. Mr. Brown also testified that after the meeting with the accountant, both Mr. Martinez and Mr. Herrell confirmed that if a distribution was made, then Mr. Brown would receive it. He clearly testified that he expected that the distribution would be "in excess of $200,000" and that he sold his stock "with the understanding" that he would receive whatever bonus they decided to pay out, which he "assumed" would be $200,000 or more. Thus, even assuming that Mr. Martinez asserted on November 23, 2013 that no distribution would be made, Mr. Brown undisputedly acquired information contrary to that statement before selling his stock. He clearly understood from Mr. Martinez that no final decision had been made about the distribution and that Mr. Martinez was likely to authorize a distribution of $200,000. In the face of Mr. Brown's own testimony, no reasonable jury could conclude that he relied on the statement that no distribution would be made in connection with the sale of his stock. *See Martin v. Hughes*, 156 Kan. 175 (1942) (a plaintiff may rely on representations as true if he has no knowledge to the contrary); *Colebaugh v. Yale New Haven Hosp., Inc*., 2017 WL 3174293, at *12 (Super. Ct. Conn. June 12, 2017) (the plaintiff's knowledge is particularly relevant to

determining whether, under all the circumstances, reliance was reasonable; knowledge of the fact misrepresented can preclude a claim that reliance on a contrary representation was reasonable); *Burger v. Allstate Ins. Co.*, 667 F.Supp.2d 738, 746 (E. D. Mich. 2009) ("fraud cannot be perpetrated upon one who has full knowledge to the contrary of a representation"); *Koral Indus. v. Security-Connecticut Life Ins. Co.*, 802 S.W.2d 650, 651 (Tex. 1990) (a plaintiff has the right to rely and upon statements only in the absence of knowledge to the contrary); *Wilson v. Henry*, 340 S.W.2d 449 (Kent. Ct. App. 1960) ("The very essence of actionable fraud or deceit is the belief in and reliance upon the statements of the party who seeks to perpetrate the fraud. Where the plaintiff does not believe the statements or where he has knowledge to the contrary recovery is denied.").

Mr. Brown's testimony also precludes a jury from concluding that he relied on Mr. Martinez's and Mr. Herrell's statements that the company was experiencing a "financial crisis" as a result of the lost Linn Energy business. Putting aside the fact that Mr. Brown has not shown that this assertion was false, Mr. Brown unequivocally testified that he did not believe that the company was in a financial crisis (rather, he described it as a "blip in the road"). The following excerpt from Mr. Brown's deposition is all but dispositive of the issue:

> Q: You've testified that they were representing to you that the company was in a crisis because they lost the Linn Energy account. But you didn't believe that that was a crisis; right?
>
> A: I still don't, no.
>
> Q: Okay. So you didn't rely upon that; is that right?
>
> A: Uh-huh.

Q: What did you rely upon that they were saying that caused you to determine the sales price for this stock?

A: The sales price of 450,000?

Q: Right. What did you rely upon from them to determine that sales price?

A: Because of their attitude of not—they didn't seem that they were willing to go out and do something about it. They were wanting—if your leadership is failing you and they're not leading the company, what else are you to believe?

The "attitude" of Mr. Martinez and Mr. Herrell is not a false statement for purposes of establishing a fraud claim. But with respect to the "financial crisis" statement, Mr. Brown testified in other portions of his that he knew that the company had no debt and that there was "more work out there" such that the lost Linn Energy work was "not a big deal." In light of his deposition testimony, Mr. Brown clearly did not rely on any statements concerning a "financial crisis" in connection with the decision to sell his stock and no jury could conclude otherwise.

Lastly, the court examines Mr. Brown's allegation that Mr. Herrell told him that Mr. Martinez wanted to "move the company in a different direction." Mr. Brown testified that when Mr. Herrell made that statement, "all [Mr. Brown] wanted was to sell [his] stock" and "to make the best possible deal [he] could possibly get and get [his] stock sold." He testified that he offered a sale price of $500,000 because he "knew that's all [he] was going to get." According to Mr. Brown, he was willing to accept Mr. Martinez's counter-offer of $450,000 because he assumed he would get the year-end shareholder distribution that the parties had discussed. There is no evidence that Mr. Brown came up with the $500,000 offer based on the "different direction" statement or any analysis of what that statement might mean in terms of the sale price

of the stock.  Mr. Brown, then, directs the court to no evidence tying the "different direction" statement to any assessment of the appropriate sale price of his shares.

In sum, the evidence viewed in the light most favorable to Mr. Brown simply does not permit an inference that Mr. Brown relied on any statements made by defendants in deciding to sell his shares of stock at the price he did.  Summary judgment is granted on this claim.

## VII.  Age Discrimination

Both plaintiffs assert claims of age discrimination against defendant K&L under the Florida Civil Rights Act of 1992 ("FCRA"), Fla. Stat. § 760.10.  Specifically, plaintiffs contend that K&L discriminated against them on the basis of age when it terminated plaintiffs' employment and refused to reimburse plaintiffs for the cost of their Medicare premiums.  K&L moves for summary judgment on each of these claims.[10]

### A.  Termination of Employment

Age discrimination claims brought under the Florida Civil Rights Act are analyzed using the same framework used to decide claims brought under the ADEA.  *See Saxon v. Seminole*

---

[10] K&L also moves for summary judgment to the extent plaintiffs purport to assert age discrimination claims based on K&L's failure to provide the Browns coverage under K&L's group life insurance plan.  Plaintiffs do not address this claim or contention in their submissions and, thus, are deemed to have abandoned any such claims.  *See Maestas v. Segura*, 416 F.3d 1182, 1190 n.9 (10th Cir. 2005) (plaintiffs "appear to have abandoned [these] claims as evidenced by their failure to seriously address them in their briefs"); *Hinsdale v. City of Liberal, Kansas*, 19 Fed. Appx. 749, 768–70 (10th Cir. 2001) (affirming district court's grant of summary judgment in favor of defendant on certain claims after concluding that plaintiff had abandoned those claims by failing to address them in response to the defendant's motion for summary judgment) (citing *Coffey v. Healthtrust, Inc*., 955 F.2d 1388, 1393 (10th Cir. 1992)).

*County Pub. Schs.*, 2017 WL 2538075, at *1 (M.D. Fla. June 12, 2017) (citing *Zaben v. Air Prods. & Chems., Inc.*, 129 F.3d 1453, 1455 n. 2 (11th Cir. 1997)). Thus, to establish a prima facie case of age discrimination under the FCRA where, as here, the plaintiff was not replaced by another individual because the position was essentially eliminated, the Browns must show that (1) they were members of the protected age group; (2) they were subject to adverse employment action; (3) they were qualified to do their jobs or to assume another position at the time of discharge; and (4) "the evidence could lead a factfinder reasonably to conclude that the employer intended to discriminate on the basis of age." *See id.* (citing *Mitchell v. City of LaFayette*, 504 Fed. Appx. 867, 870 (11th Cir. 2013)). To satisfy the last element, plaintiffs must demonstrate that K&L "consciously refused to consider retaining" them because of their age or "regarded age as a negative factor in such consideration." *See Giraldo v. Miami-Dade College*, 2017 WL 2856433, at *9 (S.D. Fla. Feb. 28, 2017) (citations omitted). K&L moves for summary judgment on plaintiffs' discriminatory discharge claims on the grounds that they cannot satisfy the fourth element of their prima facie case. The court agrees and grants summary judgment on these claims.

In an effort to prove that K&L intended to discriminate on the basis of age, plaintiffs allege that Mr. Martinez and Mr. Herrell made certain age-based comments reflecting a discriminatory bias. But most of the comments alleged by plaintiffs are not supported by the evidence and those that do find support in the record simply do not reflect a discriminatory bias. Plaintiffs allege that Mr. Martinez and Mr. Herrell "wanted to get rid of John Brown because he was not worth much to them anymore because of his age." In support of that allegation, plaintiffs direct the court only to Barbara Brown's deposition testimony. But in the portion of

her deposition that is referenced by plaintiffs, Mrs. Brown testified that John Brown had a "feeling" that Mr. Martinez and Mr. Herrell "wanted to get rid of him." The testimony continued as follows:

> Q: Did he say why he got the feeling they wanted to get rid of him?
> A: Probably because he wasn't worth much to them anymore.
> Q: Say that again, please.
> A: Probably because he felt like he wasn't worth much to them anymore.
> Q: And why was that?
> A: Probably because of his age for one thing.

Nothing in this testimony reflects any age-based statement made by Mr. Martinez or Mr. Herrell. Ms. Brown's testimony about the motivation of Mssrs. Martinez and Herrell is rank speculation and no jury could conclude from her testimony that K&L terminated Mr. Brown based on his age. In a similar vein, plaintiffs assert that Mr. Martinez and Mr. Herrell "talked a lot about John Brown's age and how he was a waste of money." In support of this assertion, plaintiffs direct the court to only two lines of Barbara Brown's deposition, in which she responded as follows to a question about why she believed that Mr. Brown felt like he was not worth much to the company anymore because of his age:

> A: Well, because they talked about it a lot, about his age, and he was a waste of money.

As K&L highlights, however, nothing in this single sentence connects Mr. Brown's age with the idea that Mr. Brown was a "waste of money." In fact, Ms. Brown continued her testimony by explaining how Mr. Martinez and Mr. Herrell talked about Mr. Brown's age—that they would frequently tell Mr. Brown that "you really look good for your age" and that "Barb, she holds her age well." These comments do not suggest that K&L viewed the Browns' ages as a negative

factor or that K&L terminated the Browns' employment based on age. No reasonable jury could conclude otherwise.

Plaintiffs also assert that Mr. Martinez perceived Mr. Brown as "mostly retired." Mr. Martinez does not dispute that fact. Indeed, plaintiffs themselves advised the Board and shareholders in August 2001 that they were "semi-retiring." But nothing in the record reflects that Mr. Martinez had a negative view of Mr. Brown's semi-retirement or that Mr. Martinez believed that Mr. Brown's retirement status was negatively affecting the business. In fact, the deposition testimony of Mr. Martinez that Mr. Brown highlights reflects that Mr. Martinez respected Mr. Brown's decision to enjoy retirement activities such as playing golf and that such activities were consistent with the consulting arrangement to which the parties had agreed.[11] Contrary to plaintiffs' argument, then, no reasonable jury could conclude from Mr. Martinez's reference to Mr. Brown as "mostly retired" that Mr. Martinez terminated Mr. Brown's employment based on his age.

The only other evidence offered by plaintiffs to prove that K&L intended to discriminate on the basis of age is that K&L, near the time when it terminated plaintiffs' employment, also terminated the employment of a 55-year-old shop foreman. Plaintiffs contend that this termination suggests a "pattern" of targeting older employees that buttresses their claims. It does not. In order to demonstrate a pattern of discrimination, plaintiffs must come forward with

---

[11] In passing, Mr. Brown also contends that he routinely received a lower bonus than Mr. Martinez and Mr. Herrell and he suggests that his bonuses were lower based on his age. K&L, however, has produced ample evidence that any difference in bonus amounts was due to the fact that Mr. Martinez and Mr. Herrell were present in the office nearly every day, including some weekends and evenings, while Mr. Brown was living in Florida and, as he had contracted to do, enjoying retirement activities. Mr. Brown has not shown that this reason is false or unworthy of belief and, as such, cannot proceed to trial on this claim.

evidence of "similarly situated" employees—that is, employees who have common experience, education, skills and qualifications. *See Minton v. American Bankers Ins. Group, Inc*., 2002 WL 1040984, at *8 (S.D. Fla. Apr. 24, 2002). Because the shop foreman is clearly not similarly situated to the Browns, the termination of that foreman is not probative of whether K&L discriminated against the Browns on the basis of age. *See id*.

Viewing the evidence in the light most favorable to plaintiffs, no reasonable jury could conclude that K&L terminated plaintiffs' employment based on age. Summary judgment on these claims is granted.


*B. Medicare Premiums*

It is undisputed that K&L has always provided a Blue Cross Blue Shield (BCBS) health insurance policy to its employees and that K&L paid the entire premium for its employees. In 2010, BCBS informed plaintiffs that they were required to subscribe to Medicare because K&L had dropped below 20 employees and that Medicare would become the Browns' primary payer for health care costs. *See* 42 U.S.C. § 1395y(b)(1)(A)(ii) (in the case of working-aged beneficiaries (age 65 or older) participating in group health plans sponsored by an employer or employee organization, Medicare becomes the primary payer if the employer has fewer than 20 employees). Plaintiffs subscribed to Medicare and K&L continued to provide and pay for the same BCBS policy, which then became the Browns' secondary payer for health care costs. The Browns asked K&L to reimburse them for their Medicare premiums but K&L refused to do so. Plaintiffs assert that K&L treated them less favorably than employees outside the protected class

because K&L paid the full cost of health insurance for employees under the age of 65 but refused to pay the full cost of the Browns' health insurance.

In their submissions, the Browns first contend that K&L's refusal to reimburse them for their Medicare premiums constitutes "disparate impact" age discrimination under *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971). This theory of liability does not appear in the pretrial order and has been waived. *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) (claims or theories not included in the pretrial order are waived). The court rejects on the merits plaintiffs' disparate treatment claim with respect to K&L's refusal to pay plaintiffs' Medicare premiums. Significantly, K&L did not reduce plaintiffs' coverage at all—it continued to provide and pay for the BCBS policy. It simply failed to reimburse plaintiffs for the cost of the Medicare premiums once federal law required plaintiffs to subscribe to Medicare. While plaintiffs allege that K&L had promised to "provide health insurance" to plaintiffs for the duration of their lives, and while K&L's refusal to pay Medicare premiums might constitute a breach of that agreement, the refusal does not suggest age discrimination under the FCRA. Stated another way, there is no evidence that K&L subjected plaintiffs to an adverse employment action. Plaintiffs do not assert that their benefits changed in any respect, only that K&L declined to reimburse plaintiffs for their Medicare premiums once federal law required that they subscribe to Medicare. Summary judgment, then, is granted on these claims.


## VIII. Kansas Wage Payment Act

Both plaintiffs assert a claim under the Kansas Wage Payment Act (KWPA). The KWPA gives employees the right to receive their "wages due" and concerns when and how

those wages are paid. *See* K. S.A. § 44–314. In those instances when an employer willfully fails to pay an employee his or her wages, the KWPA provides that the employer is liable for both the wages due and a penalty in an amount up to 100% of the unpaid wages. *See id*. § 44–315(b). The KWPA defines "wages" as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis less authorized withholding and deductions." *Id*. § 44–313(c). Kansas Administrative Regulations defines "or other basis" within the meaning of K.S.A. 44-§ 313(c) as:

> all agreed compensation for services for which the conditions required for entitlement, eligibility, accrual or earning have been met by the employee. Such compensation may include, but is not limited to, profit sharing, fringe benefits, or compensation due as a result of services performed under an employment contract that has a wage rate required or implied by state or federal law. Conditions subsequent to such entitlement, eligibility, accrual or earning resulting in a forfeiture or loss of such earned wage shall be ineffective and unenforceable.

K.A.R. § 49–20–1(d).

In the pretrial order, plaintiffs assert that they are entitled to "wages" owed under the lifetime employment agreement—that is, "wages" from November 2013 through the present (and into the future) as well as merit bonuses that they were not paid in 2013 and subsequent years. Defendants move for summary judgment on plaintiffs' KWPA claims on the grounds that, even assuming the existence of a valid and enforceable agreement for lifetime employment, damages stemming from a breach of that agreement would not qualify as "wages" under the KWPA. The court agrees that summary judgment on this basis is appropriate.

It is undisputed that plaintiffs have not rendered any "labor or services" as "employees" for defendants since November 25, 2013. Because plaintiffs have not been employed by K&L since November 2013, it is clear that they have not earned wages since that time. To the extent

defendants owed plaintiffs a monthly salary or annual merit bonuses beyond that point, defendant owed those amounts, if at all, under the terms of the lifetime employment contract rather than as "wages" in exchange for labor or services performed by plaintiffs. Any damages sustained by plaintiffs, then, stem from the breach of the purported lifetime employment contract. In response to defendants' motion, plaintiffs make no persuasive argument that the amounts they seek constitute "compensation for labor or services rendered" within the meaning of the KWPA.[12] Rather, plaintiffs focus instead on the year-end merit bonus that plaintiffs arguably should have received at the end of the 2013 fiscal year. According to plaintiffs, they undisputedly provided services to defendants for more than 11 months of the fiscal year and should have received a bonus for those services.

This argument is rejected. The evidence reflects that, on November 29, 2013, the Board of Directors gave the authority to Mr. Martinez, at his sole discretion, to "distribute year-end bonuses to company employees based on merit and performance for the 2013 fiscal year." For two reasons, then, plaintiffs cannot establish that they were entitled to the year-end bonus as "wages" under the KWPA. First, plaintiffs were not "company employees" who were authorized to receive a bonus. Second, the bonus was entirely discretionary. Plaintiffs direct the court to no cases holding that a discretionary bonus constitutes "earned wages" for purposes of a state's wage payment statute.

In the absence of any such cases, the court concludes that the Kansas Supreme Court, if faced with the question, would conclude that a discretionary bonus does not constitute "wages"

---

[12] In an effort to show that plaintiffs may still be considered "employees," plaintiffs suggest that they have remained willing and able to assist K&L at any time but that K&L has not called upon them to do so.

for purposes of the KWPA. This approach comports with cases from jurisdictions in which the definition of "wages" in the particular state's Wage Payment statute mirrors the definition of "wages" in the KWPA. Connecticut's Wage Payment statute, for example, defines "wages" as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation." C.G. S.A. § 31–71a. The Connecticut Supreme Court has held that bonuses that are awarded on a discretionary basis and are not linked solely to the ascertainable efforts of the particular employee are not wages under Connecticut's wage payment statute. *See Weems v. Citigroup, Inc.*, 961 A.2d 349, 355-57 (Conn. 2008). Similarly, Indiana's Wage Statute defines "wages" as "all amounts at which the labor or service rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece or commission basis, or in any other method of calculating such amount." *See Quezare v. Byrider Fin., Inc.*, 941 N.E.2d 510, 513 (Ind. Ct. App. 2011). In *Quezare,* the court held that "purely discretionary" bonuses are not wages for purposes of wage payment statute. *See id.* at 514-15 (citing *Pyle v. Nat'l Wine & Spirits*, 637 N.E.2d 1298, 1299–1300 (Ind. Ct. App. 1994) (concluding that bonus system was discretionary and therefore bonuses were not wages)). Summary judgment on this claim is warranted.


**Retaliatory Discharge Claim**

Plaintiffs also assert that defendants terminated their employment in retaliation for reporting illegal company conduct. The Kansas Supreme Court has recognized the tort of retaliatory discharge as a public policy exception to the employment-at-will doctrine. *See Palmer v. Brown*, 242 Kan. 893, 896 (1988). As the Court noted in *Palmer*:

> Public policy requires that citizens in a democracy be protected from reprisals for performing their civil duty of reporting infractions of rules, regulations, or the law pertaining to public health, safety, and the general welfare. Thus, we have no hesitation in holding termination of an employee in retaliation for the good faith reporting of a serious infraction of such rules, regulations, or the law by a co-worker or an employer to either company management or law enforcement officials (whistle-blowing) is an actionable tort.

*Id*. at 900. To establish this claim, a plaintiff has the burden of proving by clear and convincing evidence, under the facts of the case, that a reasonably prudent person would have concluded the plaintiff's employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare; that the employer had knowledge of the plaintiff's reporting of such violation prior to discharge of the plaintiff; and that a causal connection exists between the report and the plaintiff's discharge. *Id*.; *Poull v. Affinitas Kansas, Inc.,* 2010 WL 1462763, at *7 (Kan. App. Apr. 8, 2010). If the plaintiff establishes a prima facie case, the defendant then bears the burden of producing evidence that the plaintiff was terminated for a legitimate nonretaliatory reason. The burden then shifts back to the plaintiff to show that the defendant's reasons are pretextual. *Goodman v. Wesley Medical Center, LLC*, 276 Kan. 586, 590 (2003).

Defendants move for summary judgment on this claim on the grounds that plaintiffs cannot establish a prima facie case of retaliatory discharge. According to defendants, any "complaints" made by plaintiffs do not constitute "reports" of any violation of rules, regulations, or the law and, in any event, there is no evidence of a causal connection between any reports and plaintiffs' discharge. The court agrees. In their submissions, plaintiffs assert that their retaliatory discharge claims are based on the following reports: a report made by John Brown in 2003 to Mr. Martinez and the company attorney that Mr. Herrell was embezzling money from

the company and engaging in improper accounting practices; a conversation that Barbara Brown had in 2009 with Mr. Herrell in which she advised him that he was calculating fuel tax refunds incorrectly; and a conversation that John Brown had in October 2013 with Mr. Herrell in which Mr. Brown asked Mr. Herrell about fuel charges that were missing from the preliminary financial report for September 2013. Even viewed in the light most favorable to plaintiffs, the evidence does not support a prima facie case of retaliatory discharge with respect to any of these alleged reports.

John Brown's report about potential embezzlement and improper accounting practices in 2003 is simply too remote in time to support any inference that the report was causally connected to plaintiffs' discharge ten years later. Moreover, plaintiffs have come forward with no additional evidence of causation. To the extent, then, that plaintiffs' retaliatory discharge claim is based on any reports John Brown made in 2003 about alleged embezzlement and improper accounting practices, summary judgment is required. *See Rome v. Kansas City Water & Light Dept.*, 2005 WL 2138736, at *4 (Kan. App. Sept. 2, 2005) (to support a causal connection in a retaliatory discharge claim, there must be proximity in time between the report and the discharge of the reporter; plaintiff's discharge seven years after report could not support a causal connection); *Howard v. Beech Aircraft Corp.*, 1995 WL 355252, at *4 (10th Cir. June 14, 1995) (protected activity too remote in time to have any bearing on employment decision made eleven years later).

With respect to Barbara Brown's 2009 conversation with Mr. Herrell about fuel tax refunds, there is simply no evidence from which a reasonable jury could conclude that Ms. Brown was reporting any illegal conduct. *See Fowler v. Criticare Home Health Services, Inc.*,

27 Kan. App. 869, 876 (2000) (for retaliatory discharge claim to survive summary judgment, plaintiff must come forward with evidence of a report "of illegal . . . company conduct"). Plaintiffs direct the court to only 2 pages of Ms. Brown's deposition in which she discusses her 2009 report. Ms. Brown testified that Mr. Herrell "told me what he was getting back on his exempt fuel tax" and that she "told him it was incorrect. There was no way he could be getting that much money back." According to Ms. Brown, she told Mr. Herrell that "his figures were incorrect." Notably absent from Ms. Brown's testimony is any expression to Mr. Herrell (or anyone else for that matter) of any belief that Mr. Herrell was engaged in illegal conduct or any reference to any potential violation of any rule, regulation or law. At the most, the evidence supports an inference that Ms. Brown believed that Mr. Herrell was calculating the refund incorrectly. Suffice it to say, there is nothing in Ms. Brown's testimony concerning her conversation with Mr. Herrell that any jury could reasonably construe as a report of unlawful conduct.

Plaintiffs' evidence concerning Mr. Brown's October 2013 conversation with Mr. Herrell suffers from the same deficiency. According to plaintiffs, Mr. Brown notified Mr. Herrell that the September 2013 financial report did not show any fuel charges. Plaintiff's evidence reflects that Mr. Herrell explained that he had not yet received the figures from Mr. Martinez but that he would do so. Within a few minutes of this conversation, Mr. Herrell obtained the figures that were missing from the report and provided those figures to plaintiffs. The record is devoid of any evidence that Mr. Brown reported illegal conduct with respect to the fuel charges on the financial statement or otherwise expressed concern about any potential violation of the law.

Without such evidence, Mr. Brown cannot establish a prima facie case of retaliatory discharge. *See id*. Summary judgment on this claim is granted.[13]

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' motion for partial summary judgment (doc. 67) is **granted in part and denied in part**.

**IT IS FURTHER ORDERED BY THE COURT THAT** the trial of this case is specially set to begin on **Monday, November 27, 2017 at 9:30am**. The court will separately issue a trial order establishing deadlines relating to trial.

**IT IS SO ORDERED.**

Dated this 1st day of September, 2017, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

---

[13]   Ms. Brown testified that she noticed certain "financial discrepancies" in the financial statements of the company in 2013 but there is no evidence that she reported any concerns about those alleged discrepancies to anyone other than Mr. Brown.